**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

EXPRESS SCRIPTS, INC.

                          Plaintiff,

v.

THE FEDERAL TRADE COMMISSION,

- and -

LINA M. KHAN,
in her official capacity as Chair
of the Federal Trade Commission,

                          Defendants.

Case No. 4:24-cv-1263-SRC

**Oral Argument Requested**

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 2

    A.    PBMs and the FTC's Prior Recognition of Their Pro-Competitive Benefits ..................................................................................................... 2

    B.    The FTC's About-Face and Targeting of PBMs Under Chair Lina Khan ............................................................................................................ 4

    C.    The FTC's Publication of Its Report and Press Release ......................... 5

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ....................................................................................................................... 7

I.    EXPRESS SCRIPTS' APA CLAIMS (COUNTS III AND IV) ARE PROPERLY BEFORE THIS COURT ............................................................................................. 7

    A.    The publication of a false Report is not committed to the FTC's discretion ................................................................................................... 8

    B.    The Report is final agency action ........................................................... 11

II.    EXPRESS SCRIPTS HAS PLAUSIBLY ALLEGED DEFAMATION (COUNT I) ........................... 14

    A.    The APA waives sovereign immunity for Express Scripts' defamation claim ....................................................................................... 14

    B.    The Supremacy Clause does not preclude Express Scripts' defamation claim ....................................................................................... 17

    C.    Express Scripts has plausibly alleged that the FTC's statements are false ............................................................................................................ 18

III.    THE COMPLAINT PLAUSIBLY ALLEGES THAT THE FTC VIOLATED EXPRESS SCRIPTS' RIGHT TO DUE PROCESS (COUNT II) ............................................................... 22

    A.    The FTC's false Report deprived Express Scripts of a protected interest ....................................................................................................... 23

    B.    Express Scripts has plausibly alleged that its due process rights were violated ............................................................................................. 24

IV.    EXPRESS SCRIPTS' ARTICLE II CLAIM (COUNT V) SURVIVES *HUMPHREY'S EXECUTOR* AND *COLLINS*.................................................................................................. 29

CONCLUSION....................................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ................................................13

*Arizona v. California*, 283 U.S. 423 (1931)................................................................................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................................................7, 28

*Bell v. New Jersey*, 461 U.S. 773 (1983) ..................................................................................11

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................................11

*Berkshire Employees Ass'n of Berkshire Knitting Mills v. NLRB*, 121 F.2d 235
(3d Cir. 1941)....................................................................................................................25

*Black Hills Institute of Geological Research v. DOJ*, 12 F.3d 737 (8th Cir. 1993) ...............14, 15

*Block v. North Dakota*, 461 U.S. 273 (1983) ............................................................................16

*Bohn v. Dakota County*, 772 F.2d 1433 (8th Cir. 1985)........................................................23, 24

*Buckler v. United States*, 919 F.3d 1038 (8th Cir. 2019).............................................................16

*Cambranis v. Blinken*, 994 F.3d 457 (5th Cir. 2021).................................................................16

*Carlson v. Green*, 446 U.S. 14 (1980) .....................................................................................15

*Chamber of Commerce of United States of America v. CFPB*, 691 F. Supp. 3d 730
(E.D. Tex. 2023) ................................................................................................................14

*Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir.
1970) ............................................................................................................................24, 26

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)................................................8

*Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997)...................................................................10

*Cockram v. Genesco*, 680 F.3d 1046 (8th Cir. 2012) ................................................................19

*Collins v. Yellen*, 594 U.S. 220 (2021) ...................................................................................30

*Department of Commerce v. New York*, 588 U.S. 752 (2019)......................................................10

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189
(1989)................................................................................................................................24

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ...............................................8

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002) .................................................................9

*El-Shifa Pharmaceutical Industries Company v. United States*, 706 F.3d 836
 (D.C. Cir. 2010) (en banc) ........................................................................................16

*Fleming v. FTC*, 670 F.2d 311 (D.C. Cir. 1982) ............................................................10

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852 (4th Cir.
 2002) ..........................................................................................................................13

*Forsyth County v. U.S. Army Corps of Engineers*, 633 F.3d 1032 (11th Cir. 2011) ......................9

*FTC v. Freecom Communications, Inc.*, 966 F. Supp. 1066 (D. Utah 1997) ................11

*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ........................................12

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959) ...........................................25

*Hart v. United States*, 630 F.3d 1085 (8th Cir. 2011) ...................................................16

*Hawkes Co. v. U.S. Army Corps of Engineers*, 782 F.3d 994 (8th Cir. 2015) ...............11

*Heckler v. Chaney*, 470 U.S. 821 (1983) .........................................................................8

*Hui v. Castaneda*, 559 U.S. 799 (2010) ...................................................................15, 16

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) .......................................29

*In re Crocker*, 941 F.3d 206 (5th Cir. 2019) .................................................................10

*In re Morgan*, 573 F.3d 615 (8th Cir. 2009) .................................................................27

*Interco Inc. v. FTC*, 478 F. Supp. 103 (D.D.C. 1979) ..................................................10

*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) ........................................12

*Jaymar-Ruby v. FTC*, 651 F.2d 506 (7th Cir. 1981) .....................................................10

*Jenkins v. McKeithen*, 395 U.S. 411 (1969) ...............................................24, 25, 26, 27

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951) ..........17, 25, 27

*Jones v. McNeese*, 746 F.3d 887 (8th Cir. 2014) ..........................................................23

*Keating v. FAA*, 610 F.2d 611 (9th Cir.1979) ................................................................8

*Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988) ..........................................................17

*Kroupa v. Nielsen*, 731 F.3d 813 (8th Cir. 2013) ..........................................................24

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) .......................................17

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)...................................................................26, 27

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ........................................................................................................16

*Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011)..................................15

*NAACP v. Federal Power Commission*, 425 U.S. 662 (1976) .......................................................9

*Natural Resources Defense Council, Inc. v. Thomas*, 845 F.2d 1088 (D.C. Cir. 1988) .......................................................................................................13, 14

*Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952 (8th Cir. 2020) ..........................................................................................................7, 28

*New York v. Tanella*, 374 F.3d 141 (2d. Cir. 2004)....................................................................17

*Ohio v. Thomas*, 173 U.S. 276 (1899) ........................................................................................18

*Osborn v. United States*, 918 F.2d 724 (8th Cir. 1990) ...............................................................7

*Pacific Northwest Generating Co-operative v. Bonneville Power Administration*, 596 F.3d 1065 (9th Cir. 2010) ......................................................................................8

*Parsons v. DOJ*, 878 F.3d 162 (6th Cir. 2017) ..........................................................................13

*Paul v. Davis*, 424 U.S. 693 (1976) ...................................................................................23, 24

*Peoples National Bank v. Office of Comptroller of Currency of the United States*, 362 F.3d 333 (5th Cir. 2004) ......................................................................................13

*Perez Perez v. Wolf*, 943 F.3d 853 (9th Cir. 2019)......................................................................8

*Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017).............................................15, 16

*Phyllis Schlafly Revocable Trust v. Cori*, 512 F. Supp. 3d 916 (E.D. Mo. 2021) ..........................7

*Scenic Holding, LLC v. New Board of Trustees of Tabernacle Missionary Baptist Church, Inc.*, 506 F.3d 656 (8th Cir. 2007) ....................................................................28

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)...........................................................................29

*Sierra Club v. Wheeler*, 956 F.3d 612 (D.C. Cir. 2020) .............................................................16

*South Dakota v. DOI*, 775 F. Supp. 2d 1129 (D.S.D. 2011).......................................................27

*Space Exploration Technolo-Gies Corp. v. NLRB*, 2024 WL 3512082 (W.D. Tex. July 23, 2024)................................................................30

*Stone v. INS*, 514 U.S. 386 (1995) ................................................................10

*Target Training International, Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014)........................11

*Texas v. DHS*, 123 F.4th 186 (5th Cir. 2024) ..............................................15, 16, 17, 18

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019)................................................................12

*Texas v. Thompson*, 70 F.3d 390 (5th Cir. 1995)................................................................23

*Transportation Intelligence, Inc. v. FCC*, 336 F.3d 1058 (D.C. Cir. 2003) ....................................8

*Truax v. Raich*, 239 U.S. 33 (1915) ................................................................23

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ................................................................17

*Turntine v. Peterson*, 959 F.3d 873 (8th Cir. 2020)................................................19, 20, 21

*U.S. Information Agency v. Krc*, 989 F.2d 1211 (D.C. Cir. 1993) ....................................15

*Ulrich v. Pope County*, 715 F.3d 1054 (8th Cir. 2013) ................................................................27

*United States ex rel. De Luca v. O'Rourke*, 213 F.2d 759 (8th Cir. 1954)................................27

*United States v. Cavanaugh*, 643 F.3d 592 (8th Cir. 2011)................................................................29

*United States v. Johnson*, 541 F.2d 710 (8th Cir. 1976)................................................................9

*United States v. Washington*, 596 U.S. 832 (2022) ................................................................18

*Veldhoen v. United States Coast Guard*, 35 F.3d 222 (5th Cir. 1994) ........................................13

*Watkins v. City of St. Louis, Missouri*, 102 F.4th 947 (8th Cir. 2024)........................................27

*Webter v. Doe*, 486 U.S. 592 (1988)................................................................9

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ................................................................23

*Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006)................................................................17

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ........................................26

## DOCKETED CASES

*Hawai'i v. CaremarkPCS Health, LLC*, No. 1:23-cv-464 (D. Haw.)................................................................12

*Massachusetts v. Eli Lilly & Co.*, Civ. Action No. 2584CV0086 (Sup. Ct. Mass.) ....................12

*Puerto Rico v. Eli Lilly*, No. 3:23-cv-01127 (D.P.R.) ............................................................ 12

*Texas v. Eli Lilly & Co.*, No. 1:24-cv-1402 (W.D. Tex.) ........................................................ 12

## CONSTITUTIONAL, STATUTORY, AND RULE PROVISIONS

U.S. Const. amend. V ................................................................................................................ 22

5 U.S.C.
     § 701 ................................................................................................................................ 8
     § 702 ........................................................................................................ 14, 15, 16, 18
     § 704 .............................................................................................................................. 11

15 U.S.C. § 46 .............................................................................................................. 1, 8, 13

16 U.S.C.
     § 824d .............................................................................................................................. 8
     § 838g .............................................................................................................................. 8

47 U.S.C. § 302a ...................................................................................................................... 8

49 U.S.C. § 1421 (1976) .......................................................................................................... 8

Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252,
     94 Stat. 374 ................................................................................................................. 10

Federal Rule of Civil Procedure 12 ......................................................................................... 7

## OTHER AUTHORITIES

Carlton, Dennis, et al., *PBMs and Prescription Drug Distribution: An Economic
     Analysis of Criticisms Levied Against Pharmacy Benefit Managers* (July
     19, 2024) .................................................................................................................. 19, 21

CVS Health, *Independent Pharmacies: Myths Versus Reality* 9 (Aug. 10, 2024),
     https://www.cvshealth.com/content/dam/enterprise/cvs-
     enterprise/pdfs/2024/drug-costs/2024-08-10-FTC-White-Paper-on-
     Independent-Pharmacies.pdf ........................................................................................ 29

Ferguson, Andrew N., Commissioner, FTC, *Concurring Statement Regarding the
     Pharmacy Benefit Managers Interim Staff Report*, FTC Matter No.
     P221200 (July 9, 2024) ............................................................................ 7, 20, 22, 26

FTC, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug
     Costs and Squeezing Main Street Pharmacies, Interim Staff Report* (July
     2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-
     managers-staffreport.pdf ........................................................................... 1, 6, 21, 22

FTC, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (Jan. 2025), https://www.ftc.gov/system/ files/ftc_gov/ pdf/PBM-6b-Second-Interim-Staff-Report.pdf ............................................21

Holyoak, Melissa, Commissioner, FTC, *Dissenting Statement in the Matter of the Pharmacy Benefit Managers Report*, FTC Matter No. P221200 (July 9, 2024) ................................................................................................6, 9, 20, 26

Press Release, FTC, *FTC Releases Report on Prescription Middlemen* (July 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-releases-interim-staff-report-prescription-drug-middlemen ............................................11

Scalia, Antonin & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ...........................................................................................................10

## INTRODUCTION

The Federal Trade Commission ("FTC") issued its July 2024 Report ("Report") with a defamatory title and press release, falsely asserting that pharmacy benefit managers ("PBMs") are "inflating drug costs" "at the expense of patients" and calling out by name Plaintiff Express Scripts, Inc. The predictable and intended consequence was to paint a target on PBMs' backs that has led to multiple lawsuits against Express Scripts. For decades, prior to Commissioner Khan's tenure as FTC Chair, the FTC itself consistently recognized PBMs' pro-competitive benefits in *lowering* drug prices, and any fair consideration of the extensive evidence PBMs submitted to the FTC compels the same conclusion. Under Chair Khan's leadership, however, the FTC flatly ignored that evidence in favor of a biased process with a preordained outcome. The resulting Report defies the public interest, violates due process, and prejudges the facts in pursuit of a false political narrative that impugns Express Scripts' reputation and unfairly places the burden on the company to set the record straight without providing any forum for it to do so. The Court should reject the FTC's attempts to evade accountability for these blatant violations of federal and state law.

The FTC Act requires the Report to be "in the public interest." 15 U.S.C. § 46(f). The FTC claims—incredibly—that this standard has no meaning and that the agency has unreviewable discretion to publish even false and misleading information that harms American businesses. That breathtaking assertion of agency authority flies in the face of the statute's text, which creates a limit, not a blank check. And it conflicts with numerous cases recognizing that the "public interest" standard has meaning and is judicially enforceable. The FTC's other gambit is just as remarkable: to downplay the report as at best "preliminary," "qualified," "limited," and "tentative" views of "subordinate officials"—i.e. "the staff"—and "not a statement or report of the Commission" in order to defeat review of Express Scripts' claims under the Administrative Procedure Act ("APA"). Courts look beyond labels and *post hoc* backpedaling to the actual process and consequences of

1

the agency's action.  Here, the Commission's vote to issue the Report consummated its decision-making as to the Report, which brands Express Scripts and other PBMs responsible for "inflating drug prices" paid by patients—inflicting inevitable reputational harm and spawning litigation.

Called to account for its actions, the FTC does not even defend the literal truth of such statements.  Instead, here again it quotes other, qualified statements in the Report to argue that the FTC made no definitive findings, much less the unqualified findings advertised in the Report's title and the agency's press release.  That only confirms the rash and political nature of the Report. It does not, however, defeat Express Scripts' plausible allegations of defamation under Missouri law.  Nor can the FTC hide behind the Federal Tort Claims Act ("FTCA") and the Supremacy Clause.  The FTCA applies only to damages actions.  Express Scripts seeks declaratory and injunctive relief, so the FTCA's bar on damages actions for libel has no bearing on this case.  As the Eighth Circuit has held, the APA's clear waiver of sovereign immunity for non-monetary relief extends to non-APA claims like Express Scripts' defamation claim here.  And the Supremacy Clause does not preclude federal courts from enjoining a federal agency to stop defaming a private party just because the party's claims arise under state common law.

The FTC's responses to Express Scripts' due process and Article II claims fare no better. Express Scripts plausibly alleges reputational and business harm, which, together, give rise to a protected interest that the FTC infringed.  And it plausibly alleges that the Commission today is unconstitutional.  The FTC's motion to dismiss should be denied in its entirety.  Given the numerous significant issues in this case, Express Scripts respectfully requests oral argument.

## BACKGROUND

### A.    PBMs and the FTC's Prior Recognition of Their Pro-Competitive Benefits

Express Scripts and other PBMs exist to lower drug costs.  Compl. ¶¶ 35, 37, 42-43. Express Scripts negotiates with drug manufacturers for rebates and price protections and with

pharmacies for discounted drug reimbursement costs to lower the cost of prescription drugs for consumers and its clients. *Id.* ¶¶ 3, 23, 32, 34, 37. PBMs' clients include employers, health insurance plans, labor unions, government programs, and other groups that offer prescription drug benefits ("plan sponsors"). *Id.* ¶ 23. PBMs assist plan sponsors in managing all or part of the prescription drug benefit offered to the plans' members. *Id.* In turn, plan sponsors lower the cost of prescription drugs for their members, which is why patients with prescription drug benefits rarely report having skipped taking prescribed drugs due to cost. *Id.* ¶ 92.

Importantly, PBMs do not set the prices of prescription drugs. *Id.* ¶ 24. Instead, drug manufacturers set prices for prescription drugs based on their own considerations, and branded drug manufacturers negotiate with PBMs for access (placement) on plan sponsor formularies in exchange for discounts (rebates) to lower branded drug net prices. *Id.* ¶¶ 24, 29. PBMs use that competition to reduce net drug costs for plan sponsors and their members. *Id.* PBMs provide numerous other services to plan sponsors and their members. *Id.* ¶ 25. These services include complex administrative functions like processing prescription claims and developing standard plan formulary offerings. *Id.* ¶¶ 26-27. PBMs also negotiate and contract with pharmacies nationwide for discounted drug reimbursement costs. *Id.* ¶ 34. Through its services, Express Scripts delivers tens of billions of dollars annually—including $38 billion in 2023 alone—in prescription drug cost savings and rebates to thousands of plan sponsors. *Id.* ¶ 37. Numerous academic, government, and other studies have recognized that PBMs lower drug prices for plan sponsors. *Id.* ¶ 44. Indeed, a 2023 economic literature survey called the evidence of such cost savings "overwhelming." *Id.*

For decades, until Lina Khan became its Chair, the FTC recognized the benefits of PBMs on a bipartisan basis. *Id.* ¶ 69. In various letters and statements since 2006, the FTC has found that PBMs are able "to negotiate lower prices for prescription drugs" and create incentives "for pharmacies to bid aggressively on prescription drug prices," and that their formulary and generic

substitution practices "lower[] prescription drugs costs" and "lower prices" for consumers. *Id.* In a detailed and rigorous study in 2005, the FTC found that "competition among PBMs for contracts with plan sponsors is 'vigorous.'" *Id.* ¶ 70. In 2011, the FTC concluded that "PBMs negotiate lower pharmacy costs by forming a preferred or exclusive network of retail pharmacies." *Id.* In a "comprehensive investigation" of Express Scripts' acquisition of Medco Health Solutions in 2012, involving "[m]illions of documents," the Commission concluded that competition among PBMs "is intense, has driven down prices, and has resulted in declining PBM profit margins." *Id.* ¶ 71. In 2014, the FTC reaffirmed its 2005 findings about vigorous PBM competition. *Id.* ¶ 70.

### B. The FTC's About-Face and Targeting of PBMs Under Chair Lina Khan

Lina Khan, who chaired the FTC during the Biden Administration and was replaced as Chair by President Trump on January 20, 2025, has long blamed PBMs for higher drug prices despite all of the evidence to the contrary. *Id.* ¶ 78. In 2016, as a law student with no experience in the PBM industry and at a time when the FTC's data-driven position on PBMs underscored their procompetitive effects, Khan criticized the FTC's willingness to allow "pharmacies to merge with" PBMs, claiming that "PBMs joined to pharmacies tend to steer plan members away from independent entities" and that their "conflict[s] of interest … keep drug prices high"—citing no data to support her position. *Id.*

In February 2022, Chair Khan proposed using the FTC's investigative authority under Section 6(b) of the Federal Trade Commission Act to issue orders to PBMs, including Express Scripts, to study their commercial practices. *Id.* ¶ 48. On June 6, 2022, the Commission voted to issue the orders, which contained over 180 requests and sought over five years of detailed data and information about everything from plan sponsor benefit design to formulary rules to rebates to utilization management criteria employed by plan sponsors. *Id.* ¶¶ 49, 51. Express Scripts fully complied with those burdensome requests, producing over 3.3 million pages of documents and

more than 769 million rows of data consisting of more than 11 billion data points to the FTC. *Id.* ¶¶ 52, 95.

Although the purported purpose of the orders was to do an objective study of PBM practices, Chair Khan stated in a press release announcing the orders that "PBMs practically determine which medicines are prescribed, which pharmacies patients can use, and the amount patients will pay at the pharmacy counter." *Id.* ¶ 49. Just two weeks after the orders were issued to Express Scripts and other PBMs, well before the FTC received any significant responsive materials, Chair Khan publicly claimed that PBMs "and other intermediaries … have enormous consequences on people's day-to-day lives" and repeated the point made in the press release announcing the orders, explaining that PBMs' "decisions help to determine which medicines are prescribed, which pharmacies patients can use, and the prices that patients ultimately pay at the counter." *Id.* ¶ 78. Between 2022 and 2024, Chair Khan made repeated public comments at conferences, before Congress, and at the White House, that reflected her unwavering view that PBMs "raise costs and limit access to affordable medicines." *Id.*

C. **The FTC's Publication of Its Report and Press Release**

In July 2023—ostensibly in the middle of its new study—the FTC voted to withdraw its prior data-driven, bipartisan letters, studies, and reports concerning the PBM industry. *Id.* ¶ 72. Following a 3-2 vote along party lines, the FTC issued a statement "caution[ing] against reliance" on the agency's prior statements. *Id.* Chair Khan justified the withdrawal of these documents by claiming they were "based on outdated market conditions and assumptions" and "may not reflect the current reality of the marketplace with respect to PBMs." *Id.* ¶ 73. The FTC never identified the new "realities" that supposedly warranted withdrawing the documents or identified what assumptions and market conditions were "outdated." *Id.* ¶¶ 73-74.

On July 9, 2024, the FTC issued what it styled an "interim" report ("Report") on PBMs with the false title "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies." *Id.* ¶ 57. The same day, the FTC issued a press release naming Express Scripts and touting the Report with a similarly false subtitle stating that the "[r]eport details how prescription drug middleman profit at the expense of patients by inflating drug costs and squeezing Main Street pharmacies." *Id.* ¶ 58. The press release went on to falsely claim that PBMs cause "dire consequences" to patients and that "nearly 30 percent of Americans surveyed report[ed] rationing or even skipping doses of their prescribed medicines due to high costs." *Id.* ¶ 91. Contrary to those statements, the evidence—including the voluminous data submitted by Express Scripts and other PBMs to the FTC pursuant to its 6(b) orders—shows that PBMs do not set drug prices but, in fact, negotiate with drug manufacturers and pharmacies to drive savings and compete with each other to lower drug costs, not inflate them. *Id.* ¶¶ 3, 12, 24-25, 31-35, 37-38, 41-45, 69-71, 84-86, 92-93, 97, 103, 111. Nor does the Report "detail[]" how Express Scripts profits at patients' expense. *See, e.g., id.* ¶¶ 85, 97. In fact, the Report contains no evidence to support that accusation, and numerous academic, government, and other studies show the opposite—that PBM practices benefit patients. *See, e.g.*, *id.* ¶ 44. Indeed, notwithstanding the press release's assertion that the Report "stems" from the data produced by Express Scripts and other PBMs, the Report barely references that data at all. *Id.* ¶¶ 3, 6, 10-11, 68, 76-77, 85, 87, 92, 95-96, 106-07.

FTC Commissioner Melissa Holyoak dissented, objecting to the issuance of the Report, challenging the "politicized nature of the process," and highlighting that the Report reflected no new empirical analysis to rebut the FTC's 2005 PBM report. *Id.* ¶ 76 (quoting Melissa Holyoak, Commissioner, FTC, *Dissenting Statement in the Matter of the Pharmacy Benefit Managers Report* 2, FTC Matter No. P221200 (July 9, 2024) ("Holyoak Dissent")). Then-Commissioner

(now Chairman) Andrew Ferguson separately lamented the Report's lack of rigorous analysis, explaining that the Report "relies heavily on public comments," many anonymous, and that the Commission "cannot know who submitted the comments" because it has no "method for verifying the accuracy." *Id.* ¶ 77 (quoting Andrew N. Ferguson, Commissioner, FTC, *Concurring Statement Regarding the Pharmacy Benefit Managers Interim Staff Report* 2-3, FTC Matter No. P221200 (July 9, 2024) ("Ferguson Statement").

The false Report and accompanying false statements have harmed, and continue to harm, Express Scripts, damaging its reputation and interfering with its business relationships. *Id.* ¶ 121-22. In particular, Express Scripts has been named in multiple lawsuits seeking damages and other relief that invoke the Report as a basis for their claims. *Id.* ¶¶ 119, 123.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must "allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 956 (8th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In reviewing the pleadings under this standard, the Court must," in addition to accepting all of the plaintiff's factual allegations as true, "draw all inferences in the plaintiff's favor." *Phyllis Schlafly Revocable Trust v. Cori*, 512 F. Supp. 3d 916, 924 (E.D. Mo. 2021). Likewise, under a Rule 12(b)(1) facial challenge, "a complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).

## ARGUMENT

## I. EXPRESS SCRIPTS' APA CLAIMS (COUNTS III AND IV) ARE PROPERLY BEFORE THIS COURT

Express Scripts' APA claims are legally plausible and warrant relief. Publication of a

defamatory Report contravenes the authority Congress gave the FTC.  Compl. ¶¶ 131-51.  And the Report is a final agency action that marks the consummation of the FTC's decision-making about the substance of the Report, which falsely brands Express Scripts as responsible for higher drug prices and has predictably spawned litigation against the company.

### A.    The publication of a false Report is not committed to the FTC's discretion

The FTC is permitted by statute to issue a report only if doing so is "in the public interest." 15 U.S.C. § 46(f).  The FTC argues (Mot. 6-8) that this standard is meaningless and that it can issue reports no matter how untrue, politically motivated, or damaging, relying on a narrow exception to the APA's basic presumption of judicial review of agency actions for actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  But "this limited category" has no application here.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020).

Only in "rare instances" is a statute "drawn in such broad terms that in a given case there is no law to apply," as the FTC claims here.  *Heckler v. Chaney*, 470 U.S. 821, 830 (1983) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).  Indeed, courts have consistently held that "in the public interest" and similar standards are justiciable, including in aviation ("in the public interest," 49 U.S.C. § 1421(c) (1976); *Keating v. FAA*, 610 F.2d 611, 612 (9th Cir. 1979)), energy markets ("just and reasonable" rates, 16 U.S.C. § 824d(a), "consistent with sound business principles," 16 U.S.C. § 838g; *Pac. N.W. Generating Co-op. v. Bonneville Power Admin.*, 596 F.3d 1065, 1076-77 (9th Cir. 2010)), telecommunications ("public interest, convenience, and necessity," 47 U.S.C. § 302a(a); *Transportation Intelligence, Inc. v. FCC*, 336 F.3d 1058, 1062-64 (D.C. Cir. 2003)), and many other domains.  *See, e.g.*, *Perez Perez v. Wolf*, 943 F.3d 853, 862 (9th Cir. 2019) (collecting cases).  The "public interest" standard in Section 6(f) fits squarely within this mold.

Indeed, the FTC Act supplies clear law for this Court to apply.  "[T]he use of the words

'public interest' in a regulatory statute … take meaning from the purposes of the regulatory legislation." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976). Here, the FTC Act's core purpose is to protect consumers by promoting fair competition. *See, e.g.*, *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir. 1976). Issuing a report with false statements that blatantly mischaracterizes how PBMs and prescription drug markets operate cannot promote consumers' interests or fair competition; it does the opposite and is therefore not "in the public interest." Compl. ¶¶ 4, 14, 112-15, 150-51; *see also* Holyoak Dissent 1-2, 4 (contrasting prior FTC reports issued "in the public interest" with the PBM Report, which fails to either "meet the standard of economic rigor" or "examine how PBM practices affect consumer prices").

The FTC relies (Mot. 7-9) on other statutes that, *unlike* the FTC Act, authorize an agency to take an action if the *agency* "determines" or "deems" that the action meets a standard such as the "public interest" or "national interest." Such delegations to an agency's own determination may preclude judicial review. But as the Supreme Court stressed in *Webster v. Doe*, cited by the FTC, the statute's text made clear its commitment of the challenged termination decision to the agency's discretion by authorizing termination "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,'" and "not simply when the dismissal *is* necessary or advisable to those interests." 486 U.S. 592, 600 (1988). Section 6(f) uses the latter language and authorizes publication of information only if it *is* in the public interest. It is thus also nothing like the Flood Control Act provision "grant[ing] the [Army] Secretary broad discretion to award leases 'for such periods, and upon such terms and for such purposes as *he may deem* reasonable in the public interest,'" *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1041 (11th Cir. 2011) (emphasis added), or the statutory provision "giv[ing] the FAA virtually unbridled discretion" to dismiss a complaint without a hearing "when [the Administrator] '*is of the opinion* that the complaint does not state facts that warrant an investigation,'" *Drake v.*

*FAA*, 291 F.3d 59, 62, 70-72 (D.C. Cir. 2002). Nor is it like the provision of the Federal Advisory Committee Act authorizing a designated person, "whenever *he determines it* to be in the public interest, to adjourn" a committee meeting. *Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) (emphasis added); *see id.* at 909 (distinguishing provision from one that "allow[s] adjournment when it *is* in the public interest"). That stark contrast confirms the FTC Act does not delegate final say-so over the public interest standard to the FTC.

Indeed, although a prior version of Section 6(f) authorized the FTC to publish such portions of information "as *it shall deem expedient* in the public interest," Congress deleted the italicized language in 1980 and replaced it with "as *are* in the public interest." Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 3(a), 94 Stat. 374, 374 (emphasis added). "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995); *see also In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) ("[A] significant change in language … 'presumptively connotes a change in meaning.'" (quoting Scalia & Garner, *Reading Law* 256 (2012)). The only reasonable inference from the 1980 amendment is that Congress chose to withdraw discretion from the FTC and to subject the FTC's publication of information to judicial oversight. The current text of Section 6(f) requires the FTC to publish reports only if they "*are* in the public interest." And it does not involve traditionally discretion-laden matters such as initiation of enforcement actions or national security. *See Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). The FTC's assertion of unreviewable authority to publish false and defamatory reports under Section 6(f) thus defies clear congressional intent.[1]

---

[1]    The FTC's other cases are of no help. *Jaymar-Ruby v. FTC*, 651 F.2d 506 (7th Cir. 1981), and *Fleming v. FTC*, 670 F.2d 311 (D.C. Cir. 1982), both concerned solely the FTC's release of information to state law enforcement officials. *Interco Inc. v. FTC*, 478 F. Supp. 103 (D.D.C.

## B.    The Report is final agency action

The Report is subject to judicial review under the APA because it is final agency action for which there is no other adequate remedy.  5 U.S.C. § 704.  Final agency action (1) "must mark the consummation of the agency's decisionmaking process," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Hawkes Co. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994, 999 (8th Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  The Report satisfies both prongs, despite the FTC's protests to the contrary.

The Commission's formal vote to issue the Report satisfies the "consummation" prong because there is nothing further for the agency to do with respect to the Report.  The FTC now claims (Mot. 9-10) that the Commission never meant any of it, calling the Report "tentative," "preliminary," "informal," and "interlocutory," and asserting that it "expresses the views of 'staff'" who are mere "subordinate officials" and is not actually a "statement or report of the Commission." Mot. 9-10.  But the staff did not issue the Report; the Commission did.  The FTC's own press release says, "The Federal Trade Commission … published an interim report," calling it "the Commission's interim report."  Press Release, FTC, *FTC Releases Report on Prescription Middlemen* (July 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/07/ftc-releases-interim-staff-report-prescription-drug-middlemen.  The Commission's formal vote and decision to issue the Report "represent[] a definitive statement of [the agency's] position."  *Bell v. New Jersey*, 461 U.S. 773, 780 (1983).  That the Report is based on "tentative" findings merely calls into question the legitimacy of its conclusions—not the finality of the FTC's action.

---

1979), predates Congress's 1980 removal of "deeming" language from Section 6(f).  *FTC v. Freecom Communications, Inc.*, 966 F. Supp. 1066 (D. Utah 1997), did not categorically reject judicial review.  And *Target Training International, Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014), interprets an entirely different, vaguer regulatory provision.

The Report likewise satisfies the "legal consequences" prong of final agency action. A "document [is] binding as a practical matter" when "private parties have reasonably [been] led to believe that failure to conform will bring adverse consequences." *Iowa League of Cities v. EPA*, 711 F.3d 844, 863-64 (8th Cir. 2013) (cleaned up); *see also Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002); *accord Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019). The FTC requested extensive data from Express Scripts in response to Section 6(b) orders and named Express Scripts in the Report. Through its defamatory title, the Report, as well as the accompanying press release, in effect announced that various PBM business practices that are disfavored by the Commission are in its view unlawful, and are likely targets of enforcement actions and litigation. Compl. ¶ 118. The Report claims, for example, that "exclusionary rebates" provide a basis for potential future enforcement by the FTC under Section 2 of the Sherman Act, Section 5 of the FTC Act, and Section 2(c) of the Robinson Patman Act. *Id.* Express Scripts had "reasonably [been] led to believe that failure to conform" with the Report would result in adverse consequences in ongoing or future investigations. *Iowa League of Cities*, 711 F.3d at 863-64 (quotation marks omitted).

Indeed, just days after the Report issued, the Vermont Attorney General filed a complaint against Express Scripts, relying on the Report as evidentiary support for its legal claims.[2] Compl. ¶¶ 15, 93, 119. Shortly thereafter, a specialty pharmacy sued Express Scripts and attached the entire 74-page Report as an exhibit to its complaint. *Id.* ¶ 119. The U.S. House of Representatives Committee on Oversight and Accountability cited the Report in a letter demanding that Express

---

[2]    Since Express Scripts filed the Complaint, Hawaii, Texas, Massachusetts, and Puerto Rico have also sued it and other PBMs, relying on the Report. *See* Second Am. Compl. ¶¶ 217 n.137, 224, *Hawai'i v. CaremarkPCS Health, LLC*, No. 1:23-cv-464 (D. Haw. Nov. 27, 2024), ECF No. 166; Not. of Removal, Ex. A., Compl. ¶ 376, *Texas v. Eli Lilly & Co.*, No. 1:24-cv-1402 (W.D. Tex. Nov. 15, 2024), ECF No. 2-1; Compl. ¶¶ 385, 620, *Massachusetts v. Eli Lilly & Co.*, Civ. Action No. 2584CV0086 (Sup. Ct. Mass. Jan. 13, 2025); Mot. for Leave to Am. Compl., Ex. 1, Second Am. Compl. ¶ 192, *Puerto Rico v. Eli Lilly*, No. 3:23-cv-01127 (D.P.R. Dec. 20, 2024), ECF No. 127-1.

Scripts' President retract his prior, truthful testimony and accusing him of perjury.  *Id.*

The FTC wrongly contends that these enforcement actions, lawsuits, and threats of sanction brought based on the Report cannot qualify as legal consequences because third parties are involved.  Mot 11-12 (citing *Parsons v. DOJ*, 878 F.3d 162, 168 (6th Cir. 2017), and *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852 (4th Cir. 2002)).  But neither of the cited cases involved reports that identified a specific company as a putative wrongdoer, as the PBM Report tarred Express Scripts.[3]  *Parsons*, 878 F.3d at 166; *Flue-Cured Tobacco*, 313 F.3d at 854.

More importantly, the FTC ignores that, unlike in those cases, the PBM Report was issued pursuant to Section 6(f), which involves FTC coordination with state law enforcement and Congress.  15 U.S.C. § 46(f) (authorizing information sharing to state officials so that they can undertake law enforcement activities and reports to Congress).  The Report here is analogous to the report at issue in *Natural Resources Defense Council, Inc. v. Thomas*, where an EPA Director memorandum constituted final agency action because "subordinate employees of the agency and, more importantly, cooperating state components of the compliance effort would be justified in construing the memorandum to be their marching orders."  845 F.2d 1088, 1094 (D.C. Cir. 1988).  The guidance challenged in *Appalachian Power Co. v. EPA* is similarly instructive.  208 F.3d 1015 (D.C. Cir. 2000).  There, while the EPA's guidance included a disclaimer that said, "[t]he policies set forth in this paper are intended solely as guidance [and] do not represent final Agency action," the court found otherwise because the "EPA ha[d] given the States their 'marching orders'" and clearly "expect[ed] States to fall in line, as all [did]."  *Id.* at 1023.  As the Vermont action shows, the Report constituted "marching orders" to state officials, as well as the FTC staff, to implement

---

[3]    The FTC also cites to *Peoples National Bank v. Office of Comptroller of Currency of the United States*, 362 F.3d 333 (5th Cir. 2004), and *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994), for this premise, but neither discusses third-party harm.

the FTC and Chair Kahn's anti-PBM agenda. The Report was issued to provide guidance after an investigation by agency leadership and did not identify further agency action. This is sufficient. *Thomas*, 845 F.2d at 1094. The Report telegraphs to FTC staff and the States the agency's unambiguous position on PBMs, as evidenced by subsequent enforcement actions. Far from "merely … express[ing the Commission's] view of the law," Mot. 11, the Report "obligates agency personnel to act on a particular understanding of" PBM business practices, *Chamber of Com. of United States of Am. v. CFPB*, 691 F. Supp. 3d 730, 737 (E.D. Tex. 2023) (update to CFPB manual constituted final agency action). Indeed, the FTC issued its Report after ceremoniously withdrawing over a decade of prior guidance on PBMs on which, in Chair Khan's view, parties were mistakenly relying. Compl. ¶¶ 72-74. And in addition to Vermont's action, two months after issuing its Report (and three days after Express Scripts filed this lawsuit), the FTC sued Express Scripts and other PBMs under its new approach.

## II.    EXPRESS SCRIPTS HAS PLAUSIBLY ALLEGED DEFAMATION (COUNT I)

The FTC defamed Express Scripts by falsely claiming in the title of the Report that Express Scripts is "inflating drug costs," and in the accompanying press release that it is "profit[ing] at the expense of patients" with "dire consequences" for patients' health. The Complaint describes in detail why these statements are false. *See, e.g.*, Compl. ¶¶ 3, 12, 25, 28-32, 34-35, 37-38, 42-45, 69-71, 81-93, 97, 103, 111. The FTC does not grapple with any of this or even defend the literal truth of its statements, only claiming briefly that "in context" these statements are not false, and instead primarily arguing that the Constitution gives the agency categorical license to defame private businesses. The FTC is wrong on all fronts.

### A.    The APA waives sovereign immunity for Express Scripts' defamation claim

Section 702 of the APA "waives the federal government's sovereign immunity in cases challenging agency action … and seeking relief other than money damages." *Black Hills Inst. of*

14

*Geological Rsch. v. DOJ*, 12 F.3d 737, 740 (8th Cir. 1993) (citing 5 U.S.C. § 702). That waiver applies to APA and non-APA causes of action alike, including claims under state law. *See id.* at 741 (applying waiver to "permanent possession" claim); *see Texas v. DHS*, 123 F.4th 186, 201-02 (5th Cir. 2024) ("Every one of our sister circuits has construed § 702's plain language as a waiver of sovereign immunity for all equitable actions …. And at least four of those circuits have logically taken that principle to mean that the § 702 waiver applies to *state* law claims for nonmonetary relief." (citing *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017)).

The FTC does not dispute that the APA waives sovereign immunity for non-APA causes of action for non-monetary relief like Express Scripts' defamation claim. Instead, it maintains (Mot. 15-16) that the FTCA—in waiving sovereign immunity for tort actions for monetary relief, subject to certain exceptions—"impliedly" limits the APA waiver as to tort actions for non-monetary relief. The FTC never explains *why* the FTCA "impliedly" does so. The FTCA does no such thing.

Because "Congress follows the practice of *explicitly* stating when it means to make FTCA an exclusive remedy," *Hui v. Castaneda*, 559 U.S. 799, 806 (2010) (quoting *Carlson v. Green*, 446 U.S. 14, 20 (1980)), the FTCA would only bar immunity for defamation claims seeking non-monetary relief by saying so expressly. But the FTCA "neither says nor implies anything about prospective or nonmonetary relief" as "[e]very substantive section of the statute deals only with money damages"; it thus "gives no indication, implicit or otherwise, that it meant to preclude prospective relief in general, much less the nonmonetary relief expressly authorized by § 702." *Texas v. DHS*, 123 F.4th at 203-04. Because "the FTCA d[oes] not 'impliedly forbid' the non-monetary relief" Express Scripts seeks, Section 702 "waive[s] sovereign immunity for … [its] state tort claim." *Perry Cap.*, 864 F.3d at 620-21 (quoting *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993)); *see Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775-76 (7th Cir. 2011)

(argument that "the FTCA implicitly prohibits injunctive relief in tort suits against the United States … reads too much into congressional silence").

The FTC's own cases support Express Scripts' position. The first set of cases (Mot. 13)—*Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019); *Hui*, 559 U.S. at 799; and *Hart v. United States*, 630 F.3d 1085 (8th Cir. 2011)—simply recognizes that the FTCA occasionally displaces non-FTCA actions for money damages. The second set (Mot. 12, 15-16)—*Cambranis v. Blinken*, 994 F.3d 457 (5th Cir. 2021); *Block v. North Dakota*, 461 U.S. 273 (1983); and *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)—involve attempts to use the APA waiver to circumvent other statutes "expressly forbid[ding] the relief sought." *Cambranis*, 994 F.3d at 465-66 (discussing *Block*). But the FTCA does *not* expressly forbid the non-monetary relief Express Scripts seeks on its defamation claim here. Applying the APA waiver thus does not implicate the FTCA or "end-run [its] limitations" on damages actions. *Patchak*, 567 U.S. at 216.

The FTC also relies on *El-Shifa Pharmaceutical Industries Company v. United States*, 706 F.3d 836 (D.C. Cir. 2010) (en banc), and *Sierra Club v. Wheeler*, 956 F.3d 612 (D.C. Cir. 2020), to argue that the FTCA's "more specific waiver of sovereign immunity trump[s] the APA's general waiver of sovereign immunity." Mot. 15. But those cases likewise involved claims for *monetary* relief. Moreover, *El-Shifa* "dealt with an APA cause of action …, not a sovereign immunity waiver under § 702," and "the D.C. Circuit has subsequently held that § 702 *does* extend to state law claims" for non-monetary relief. *Texas v. DHS*, 123 F.4th at 204 n.16 (discussing *El-Shifa*, 607 F.3d at 854, and *Perry Cap.*, 864 F.3d at 620); *see id.* ("then-Judge Kavanaugh's concurrence … is not to the contrary").

Separately, the FTC asserts (Mot. 16) that sovereign immunity bars Express Scripts' defamation claim for lack of final agency action. There *is* final agency action. *Supra* pp. 11-14.

But, more importantly, the "requirement of 'finality'" applies only to claims brought directly under the APA; it does not apply to non-APA claims like Express Scripts' defamation claim, just as it did not apply to "Texas's trespass claim" in *Texas v. DHS*, 123 F.4th at 199-200 n.9, because the APA waives "sovereign immunity for all equitable actions, regardless of whether they arise under the APA," *id.* at 201; *see Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006) (APA's "waiver applies regardless of whether the FTC's press release constitutes 'final agency action.'").

### B.    The Supremacy Clause does not preclude Express Scripts' defamation claim

Contrary to the FTC's argument (Mot. 16-17), the Supremacy Clause is not an obstacle to Express Scripts' defamation claim.  As an initial matter, the false and defamatory nature of the Report and the violation of Express Scripts' due process rights, *infra* pp. 22-29, place the FTC's actions well "beyond [its] authority" under Section 6(f) of the FTC Act, thereby foreclosing any reliance on Supremacy Clause immunity.  *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178 (1951); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 701 (1949) (Supremacy Clause does not bar claims for actions "not within the officer's statutory powers" or that "are constitutionally void").  Indeed, the FTC is "not entitled to Supremacy Clause immunity unless" its defamatory statements were authorized by law *and* it "had an objectively reasonable and well-founded basis to believe that [they] were necessary to fulfill [its] duties."  *Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006); *see also Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988) (officer must be "acting pursuant to the laws of the United States and … doing no more than what was necessary and proper for him to do in the performance of his duties."); *New York v. Tanella*, 374 F.3d 141, 147 (2d. Cir. 2004).  As Commissioners Ferguson and Holyoak made clear in their criticisms of the Report, Compl. ¶¶ 59-60, 76-77, and the FTC concedes in calling it

"preliminary" and "tentative," Mot. 5, 9-10, issuing the false Report was hardly "necessary," much less "proper." *See also* Compl. ¶¶ 14, 91, 112-15.[4]

Even if the FTC's defamatory statements fell within its authority, the Supremacy Clause still would not preclude Express Scripts' claim. As discussed, *supra* p. 15, Section 702 "expressly authorizes an 'injunctive decree' against 'Federal officers,'" *Texas v. DHS*, 123 F.4th at 205 n.18, and so waives immunity for the non-monetary relief that Express Scripts seeks. But Express Scripts need not even rely on the Section 702 waiver to overcome intergovernmental immunity because it does not seek to "regulate[] the United States directly." *United States v. Washington*, 596 U.S. 832, 838 (2022). Express Scripts' defamation claim "does not seek to control [the FTC] but, at most, only [seeks to] incidentally affect[]" its operation through a declaration the Report is false and defamatory and a request for its withdrawal. *Texas v. DHS*, 123 F.4th at 205.

### C.     Express Scripts has plausibly alleged that the FTC's statements are false

Express Scripts' Complaint alleges in detail facts showing that the FTC's statements in the Report title and accompanying press release—that PBMs are "inflating drug costs" and "profit at the expense of patients by [doing so]" with "dire consequences" to patients—are all patently false and defamatory under Missouri law. *See, e.g.*, Compl. ¶¶ 1, 14-15, 42-45, 58-60, 81-93, 97, 120-24, 131-38. The FTC does not contest the sufficiency of Express Scripts' allegations as to the other elements of defamation, but it argues (Mot. 18-20) that its statements are "not false in context" based on a strained and selective reading of parts of the Report. That argument, which does not even defend the literal truth of the FTC's statements, is meritless.

---

[4]     *Ohio v. Thomas*, 173 U.S. 276, 283 (1899), and *Arizona v. California*, 283 U.S. 423, 451 (1931), cited by the FTC, Mot. 17, are distinguishable because they involve state government challenges to agency actions that fell squarely within the scope of the agencies' authority.

At the threshold, the FTC's argument fails because it ignores Express Scripts' extensive factual allegations showing these statements are not "substantially true." *Cockram v. Genesco*, 680 F.3d 1046, 1052 (8th Cir. 2012). To state a claim, Express Scripts need only allege sufficient facts from which "a reasonable factfinder could conclude" that the FTC's statements were false. *Turntine v. Peterson*, 959 F.3d 873, 882 (8th Cir. 2020). Express Scripts has amply carried that burden by alleging, among other things, that:

- Drug manufacturers, not PBMs, set drug prices and PBMs cannot "inflat[e]" drug costs because they do not set those prices, *e.g.*, Compl. ¶¶ 84-86;

- PBMs profit by lowering drug costs, not inflating them, because they compete for plan sponsors' business on their ability to do precisely that, *id.* ¶¶ 31-33, 42-45;

- In 2023, Express Scripts lowered drug costs for its clients by $38 billion, and the Report contains no contrary data or analysis, *id.* ¶¶ 37, 85, 87, 110;

- Numerous academic and government studies (including by the FTC) have consistently shown that PBMs have significantly decreased drug costs, *id.* ¶ 44;

- Although the Report purports to be based on data and documents submitted by the PBMs, it is overwhelmingly not—in fact, 75% of the citations are based on public materials, including anonymous comments, *id.* ¶¶ 10, 59, 68, 77, 95-96, 98;

- Actual analysis of the data produced to the FTC for its study, as opposed to the two-drug study the Report relies on, shows that PBMs lower drug costs, *id.* ¶ 111 (citing Carlton et al., *PBMs and Prescription Drug Distribution: An Economic Analysis of Criticisms Levied Against Pharmacy Benefit Managers* (July 19, 2024) ("Carlton Rep."));

- Contrary to the title and press release, the Report's text does not actually show that PBMs are inflating drug costs or profiting at patients' expense, *id.* ¶¶ 87-88;

- The press release affirmatively misstates the Report's text and sources to say that "surveyed" patients suffered "dire consequences" due to PBMs—in fact, the FTC conducted no survey and its sources do not support the statement, *id.* ¶¶ 91-92.

These facts are more than sufficient to plausibly infer that the FTC's statements that PBMs are "inflating drug costs" and "profit at the expense of patients" are not "substantially true." *Cockram*, 680 F.3d at 1052. The FTC does not even try to argue otherwise.

19

Instead, the FTC argues (Mot. 18) that the statements are not "false in context" because, it claims, "the Interim Report establishes that PBM business practices can contribute to increased drug prices." That contradicts the FTC's argument elsewhere (*e.g.*, Mot. 5-6, 9-10) that the Report reached no conclusions at all. And it ignores the Complaint's allegations, detailed above, that any such conclusion would be false. Regardless, the contrast between what the Report *actually* says and what the title and press release *claim* it says only confirms the falsity of the FTC's statements about PBMs. As the Complaint describes in detail, the Report does *not* find that PBMs are inflating drug costs. *See, e.g.*, Compl. ¶ 109. At most, it expresses "concerns" that drug rebates "can," "may," or "could" increase costs. *Id.*; *accord* Mot. 5-6, 9-10. But the defamatory language in the title and press release is not similarly qualified and claims—without qualification—that PBMs "inflat[e] drug costs" and "profit at the expense of patients." *Id.*

Indeed, the chasm between the FTC's sweeping and categorical statements and the non-existent empirical support merely confirms that these statements are "capable of defamatory meaning." *Turntine v. Peterson*, 959 F.3d at 882; *see Cockram*, 680 F.3d at 1052. In statements issued alongside the Report, two Commissioners underscored that chasm. Compl. ¶¶ 11, 59-60, 76-77, 88-89, 94, 114. As Commissioner Holyoak observed in her dissent, the Report failed "to offer empirical evidence to support claims about the market power of PBMs." *Id.* ¶ 11 (quoting Holyoak Dissent 5); *see id.* ¶¶ 60, 76, 94, 114. She observed that the Commission and Chair Khan "attempt[ed] to mislead the public into thinking the Report draws any conclusion about the prices patients pay for healthcare. It does not. In fact, the Report says nothing about consumer costs." *Id.* ¶ 88 (quoting Holyoak Dissent 5-6); *see id.* ¶ 89. Commissioner Ferguson likewise cast grave doubt on the basis for the Report's findings, which he described as "hardly definitive." *Id.* ¶¶ 10, 59, 77, 89 (quoting Ferguson Statement 3).

Finally, the FTC incorrectly argues (Mot. 18-19) that its statements that PBMs "are 'inflating drug costs'" and "profit at the expense of patients" are not "false in context" because of a purported analysis of two drugs discussed in the Report. The FTC concedes (Mot. 19), as does the Report, that any conclusions that can be drawn from that analysis are limited, but the FTC's statements about inflated drug costs are not caveated at all and assert "objective fact[s]" that are "capable of defamatory meaning." *Turntine*, 959 F.3d at 882. Moreover, the FTC improperly disregards Express Scripts' detailed allegations that the two-drug study fails to support the defamatory statements, including because the study represents "a cherry-picked sample of two drugs—out of more than 30,000 drugs on which Express Scripts produced data," and a broader, representative study would rebut the FTC's two-drug analysis. *See, e.g.*, Compl. ¶¶ 106, 59, 98, 106, 111. On a motion to dismiss, the FTC cannot fight Express Scripts' well-pleaded allegations with its own *post hoc* interpretation of a two-drug study.[5]

Even if the FTC could offer a *post hoc* interpretation, its argument would still fail. By the FTC's own reading, the Report says at most that for *one* of the two drugs, patients using Medicare Part D "paid more out of pocket, on average than the estimated acquisition cost of their drugs" purchased from affiliated *and* unaffiliated pharmacies. Mot. 18 (quoting Report 44). That means that the supposedly higher reimbursement payments to affiliated pharmacies was not the cause of any increase in patient costs. Moreover, the Report fails to explain how, if at all, that translates

---

[5]     On January 14, 2025, after this lawsuit was filed, the Commission released a second interim report on PBMs. *See* FTC, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (Jan. 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf. While that report cherry-picks 51 additional drugs out of the thousands of drugs available, it focuses solely on specialty generics, where the majority of sales occur through pharmacies not affiliated with PBMs, Carlton Rep. 109, and like the Report here, it does not purport to provide a comprehensive analysis, instead using "may" and "can" to caveat its findings and failing to reach any conclusion about how PBM business practices allegedly increase patient out-of-pocket costs. Even if that report could be considered here, it thus fails to support the FTC's defamatory statements for much the same reasons the first Report does.

into higher out-of-pocket costs for patients even for that single drug.  And while the Report asserts that "the high reimbursement rates on the two case study drugs *may* also translate into high out-of-pocket costs for patients," Report 43 (emphasis added), it does not explain how or claim that they actually do.  Nor does the Report, for example, conclude that patients paid more out of pocket at affiliated pharmacies than at unaffiliated pharmacies.  Indeed, Commissioner Ferguson expressed concerns about the Report's overreliance on a single "case study" of two drugs and noted that the Commission did not know "whether the findings are representative" for drugs overall and still "need[ed] to learn whether any reimbursement practices [illustrated by the study] ultimately affect consumers' out-of-pocket costs."  Compl. ¶ 59 (quoting Ferguson Statement 2-3).  Thus, the "context" of the two-drug study—like the rest of the Report—only further shows the falsity of the FTC's unqualified statements.

## III. THE COMPLAINT PLAUSIBLY ALLEGES THAT THE FTC VIOLATED EXPRESS SCRIPTS' RIGHT TO DUE PROCESS (COUNT II)

The Fifth Amendment prohibits deprivations of "life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The FTC and Chair Khan violated Express Scripts' due process rights by subjecting it to a sham "study" that cost Express Scripts "millions of dollars and thousands of personnel hours" and that was "mere cover for issuing the biased PBM [R]eport that the Commission and its Chair planned to issue all along."  Compl. ¶ 123.  The Report directly names Express Scripts and "create[s] the false impression" that Express Scripts' "business practices inflate prescription drug prices and cause 'dire consequences' for patients."  *Id*. ¶¶ 122-23.  This impression, fueled by "biased, poorly researched, and error-riddled" conclusions, *id.* ¶ 120, has harmed Express Scripts' business relationships and interfered with Express Scripts' protected interest in operating a legitimate business.  The Report's false statements are accusations by a government body—the kinds of accusations that could easily, and erroneously, convince

potential business partners that Express Scripts is operating illegitimately. *See id.* ¶¶ 121, 123, 136, 138. Moreover, the Report has galvanized private suits, state enforcement actions, and a demand by Congress to rescind truthful testimony, all citing the Report. *See id.* ¶ 119.

The FTC argues (Mot. 21-22) that Express Scripts lacks a protected interest and has not shown a violation of any such interest in any event. The FTC is wrong on both points.

### A.    The FTC's false Report deprived Express Scripts of a protected interest

Express Scripts has a protected "interest in operating a legitimate business" free from the FTC's unfair, biased, and misdirected opprobrium. *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995); *see also Truax v. Raich*, 239 U.S. 33, 41 (1915) (right to earn a living is protected by due process). Express Scripts' right to be free from reputational and business-related injuries stemming from the false Report are interests protected by due process. As the Eighth Circuit has recognized, "reputational harm coupled with 'some more tangible interests' … can together be 'sufficient to invoke the procedural protection of the Due Process Clause.'" *Jones v. McNeese*, 746 F.3d 887, 898 (8th Cir. 2014) (quoting *Paul v. Davis*, 424 U.S. 693, 712 (1976)). Because the FTC and Chair Khan have "attache[d] a 'badge of infamy' to" Express Scripts through the Report, "due process comes into play." *Bohn v. Dakota Cnty.*, 772 F.2d 1433, 1436 n.4 (8th Cir. 1985) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).

The FTC's lead argument (Mot. 21)—that the Report "does not impose legal liability" or compel Express Scripts to take or cease any action—is irrelevant to any legal standard related to due process. And its next argument (*id.*)—that *Paul* forecloses Express Scripts' claim—fails because it mischaracterizes Express Scripts' claim as supposedly based solely on reputational interest. In *Paul*, the Supreme Court held that plaintiff's reputation *alone* was not a protected liberty or property interest, 424 U.S. at 711, but the Eighth Circuit has construed *Paul* to mean that "state action that both damaged a person's reputation and 'distinctly altered or extinguished' a

'right or status previously recognized by state law'" is "sufficient to invoke" the Due Process Clause, *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Paul*, 424 U.S. at 711). Express Scripts has alleged a "protectible interest in [its] reputation at stake in this case" and a right to operate a legitimate business that the Report threatens.  It is the latter that sets Express Scripts apart from the plaintiff in *Paul*.  *Cf. Bohn v. Dakota Cty.*, 772 F.2d 1433, 1436 n.4 (8th Cir. 1985) (distinguishing *Paul* where protectible family interests were at stake).

Relying on *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the FTC contends (Mot. 21-22) that the third-party lawsuits and state investigations that Express Scripts now faces cannot establish a protected interest.  But *DeShaney* stood for a different proposition—that "the Due Process Clauses generally confer no affirmative right to *governmental aid*, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  489 U.S. at 196 (emphasis added).  Express Scripts does not argue that the FTC has an affirmative obligation to prevent harm from third-party action.  Instead, Express Scripts alleges that by issuing its unfair, biased, and false Report, the FTC triggered these third-party actions that harmed Express Scripts' protected interests.

## B.    Express Scripts has plausibly alleged that its due process rights were violated

Due process applies to the FTC's exercise of its powers to conduct studies and issue reports because if a "Commission … clearly exercises an accusatory function," and is empowered to make findings that specific companies are acting improperly or even violating the law, then due process protections similar to those for adjudications are implicated.  *Jenkins v. McKeithen*, 395 U.S. 411, 427-28 (1969).  These protections include an expectation that the evidence provided to the Commission will be given due consideration.  *Id.* at 429.  Another is that the parties before the Commission "are entitled to an impartial tribunal whether it consists of one man or twenty." *Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 592 (D.C. Cir. 1970) (quoting

*Berkshire Emps. Ass'n of Berkshire Knitting Mills v. NLRB*, 121 F.2d 235, 239 (3d Cir. 1941)). Importantly, "[t]he test for disqualification [is] … whether 'a disinterested observer may conclude (the agency) has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'" *Id.* at 591 (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir. 1959), *cert. denied*, 361 U.S. 896 (1959)).

As the Complaint alleges, Express Scripts' due process rights in its reputational and business interests were violated when the FTC and Chair Khan unfairly, improperly, and tainted by bias purported to "make an actual finding," *Jenkins*, 395 U.S. at 427, that Express Scripts is acting improperly—to inflate drug costs and profit at the expense of patients. Compl. ¶¶ 57-58. As in *Jenkins* and *McGrath*, the Report "condemns without trial," "destroys without the opportunity to be heard," and "condemn[s] or place[s] beyond the pale" merely "by edict"— violations of due process for which Express Scripts is entitled to seek relief. *McGrath*, 341 U.S. at 178 (Douglas, J., concurring).

In publishing the Report, the FTC "exercise[d] a function very much akin to making an official adjudication," *Jenkins*, 395 U.S. at 427, without providing even the most rudimentary due process. For example, in issuing the Report, the FTC relied extensively on anonymous and unverified public comments that the Commission treated as fact, *see, e.g.*, Compl. ¶¶ 10, 59, but that Express Scripts could not practically rebut either before or after the Report was issued because of their anonymity, *Jenkins*, 395 U.S. at 429 (concluding Louisiana commission violated due process for, among other reasons, affording no opportunity to confront the evidence). Moreover, the evidence Express Scripts itself provided was summarily disregarded. Despite receiving "millions of documents and terabytes of data" from Express Scripts and the other PBMs, Compl. ¶ 1, the Report relied on almost none of it and overwhelmingly relied on existing public sources that fit the FTC and Chair Khan's preferred narrative, *id*. ¶¶ 3, 6, 10-11, 59, 68, 76–77, 85, 87, 92,

95-96, 106-07. *See Jenkins,* 395 U.S. at 429 (holding that practical inability to present evidence to Commission making findings of purported legal violations violated due process).

Moreover, the process of issuing the Report was tainted by clear prejudgment and bias on the part of Chair Khan and the Commission. Commissioner Khan's repeated and consistent anti-PBM statements over the course of the last decade would lead any "disinterested observer to conclude" she had "adjudged the facts as well as the law" relevant to the Report before the study ever began. *Cinderella Career & Finishing Schs., Inc.*, 425 F.2d at 591. As far back as law school, Commissioner Khan blamed PBMs for high drug costs, in language that mirrors that used in the Report eight years later. Compl. ¶ 78. During her tenure leading the FTC, Chair Khan made numerous anti-PBM statements in the same vein. *Id.* ¶¶ 55, 78. And under her leadership, the Commission took the remarkable step of withdrawing nine letters and two studies on the PBM industry that were produced by the FTC on a bipartisan basis over the course of multiple decades across the administrations of both political parties and that reflected balanced opinions about PBMs. *Id.* ¶¶ 72, 74.

Chair Khan's statements were the opposite of a "disinterested prosecutor," *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 815 (1987), instead indicating that she "inject[ed] a personal interest … into the enforcement process" when it comes to Express Scripts, *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 249 (1980); *see* Compl. ¶¶ 7-11, 73-80. But there is more. Commissioner Holyoak lamented the Report's lack of rigorous empirical analysis and the "politicized nature of the process." *Id.* ¶ 76 (quoting Holyoak Dissent 2). Commissioner Ferguson also decried the Report's reliance "in large part on public information that was not collected from the PBMs or their affiliates during the 6(b) process" and on unverified anonymous comments— further indicia of a biased process. *Id.* ¶ 77 (quoting Ferguson Statement 2). And Chair Khan's prejudgment of Express Scripts and the PBMs is consistent with findings by the House Judiciary

Committee that the FTC had become politicized under her leadership. *Id.* ¶ 80. Express Scripts has thus plausibly alleged that the FTC and Chair Khan exhibited actual bias in publishing the Report.

The FTC argues that alleging "mere bias" is insufficient for Express Scripts' due process claim because "administrative officials exercising investigatory functions are not … required to be 'neutral and detached.'" Mot. 22 (quoting *Marshall*, 446 U.S. at 248). As described above, Express is not relying solely on bias to support its due process claim. Regardless, the FTC is "not immune from the historic requirements of fairness" here "on the ground that [the Report] is not an 'adjudication' or a 'regulation' in the conventional use of those terms." *McGrath*, 341 U.S. at 173 (Frankfurter, J., concurring). The FTC must still, when "exercis[ing] a function … akin to making an official adjudication," adhere to the due process requirements associated with such an adjudication. *Jenkins*, 395 U.S. at 427. The FTC failed to do this when it came to the Report.

Next, the FTC claims that, even if its functions here are adjudicatory, Express Scripts "must bear the heavy burden of establishing that [an] administrative hearing was unfair." Mot. 23 (quoting *S. Dakota v. DOI*, 775 F. Supp. 2d 1129, 1137 (D.S.D. 2011)). But neither that case nor any of the FTC's other authorities hold that the "heavy burden" applies at the pleading stage, and it does not. Express Scripts need only make plausible allegations of an unfair process. *Watkins v. City of St. Louis, Missouri*, 102 F.4th 947, 951 (8th Cir. 2024); *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1058 (8th Cir. 2013). And the cases the FTC cites are otherwise distinguishable. In *United States ex rel. De Luca v. O'Rourke*, the Eighth Circuit held that the plaintiff failed to make a "substantial showing of bias" where the basis for his claim that he did not receive a fair hearing was that the Attorney General placed his case on a priority list of deportation cases. 213 F.2d 759, 763 (8th Cir. 1954). And in *In re Morgan*, the Eighth Circuit found, based on a full trial record, that "there [was] nothing in the record to support a claim of actual bias." 573 F.3d 615, 624 (8th Cir. 2009).

The FTC is therefore reduced to fighting the allegations in the Complaint, arguing (Mot. 23-27) that the withdrawal of its prior statements recognizing the competitive benefits of PBMs did not express bias but merely "caution[ed] regulated parties against relying on certain statements and reports"; that the disagreement among the Commissioners does not render the majority's position biased; and that Chair Khan's statements were unrelated to the Report and, in any event, were all qualified.  None of that is proper on a motion to dismiss when the factual allegations must be taken as true and all inferences drawn in Express Scripts' favor.  *See Nelson Auto Ctr., Inc.*, 951 F.3d at 956 (quoting *Iqbal*, 556 U.S. at 678).

In any event, with or without the FTC's impermissible spin, the Complaint's allegations regarding Chair Khan's statements and the actions of the Commission under her leadership clearly evince prejudgment and bias.  Although the FTC runs through Chair Khan's pointed statements about PBMs, attempting to rebut each of them in a conclusory fashion as unconnected to her official duties, unbiased, or objective, Chair Khan's statements "must" be reviewed for bias "under the totality of the circumstances," not "in isolation," *Scenic Holding, LLC v. New Bd. of Trustees of Tabernacle Missionary Baptist Church, Inc.*, 506 F.3d 656, 665 (8th Cir. 2007).  Under that standard, her statements, taken together, betray a position that is unfairly biased:

- PBMs' "conflict[s] of interest" kept "drug prices high."  Compl. ¶ 8.

- PBMs "help to determine … the prices that patients ultimately pay at the pharmacy counter."  *Id.* ¶ 78.

- PBMs can "dictate the pricing and access to life-saving drugs for so many Americans."  *Id.*

- PBMs "control" access to drugs.  *Id.*

- PBMs are relevant to the issue that Americans are "[t]oo often … price gouged for [life-saving] medications," "sometimes with devastating results."  *Id.*

- PBMs are "controlling the types of practices that independent pharmacies are facing, [and] the medicines consumers are or have not been able to access."  *Id.*

28

These statements, in totality, are more than enough to support a plausible claim of bias on the part of Chair Khan.  And while the FTC accuses Express Scripts of improperly "imput[ing] [to Chair Khan] statements (and clothing choices) of individuals speaking" at the National Community Pharmacists Association Conference on October 3, 2022, where she spoke, they neglect to mention that Chair Khan *headlined* that event, the purpose of which was to "to help NCPA raise money to fund its lobbying efforts against PBMs."[6]

## IV.    EXPRESS SCRIPTS' ARTICLE II CLAIM (COUNT V) SURVIVES *HUMPHREY'S EXECUTOR* AND *COLLINS*

The FTC contends that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), permits for-cause removal restrictions for FTC Commissioners, regardless of what powers Congress may have later granted to the agency.  Mot. 27-28.  But, as *Seila Law* recognized, *Humphrey's Executor* is confined to the facts of the "1935 FTC."  591 U.S. at 219 n.4.  The FTC's powers today vastly exceed "the 1935 FTC" and include "quintessentially executive power[s]" like setting enforcement priorities and initiating prosecutions in federal court.  *Id.* at 218-19.  *Humphrey's Executor* never considered, much less approved, the expanded FTC, so it cannot control here.  "When the Supreme Court issues an opinion with reasoning that appears to undercut an earlier decision"—as *Seila Law* undercut *Humphrey's Executor*—lower courts may "apply the earlier ruling" only "in factual contexts analogous to the earlier case."  *United States v. Cavanaugh*, 643 F.3d 592, 606 (8th Cir. 2011).  In the current context, the FTC's expanded powers require that FTC Commissioners be removable at will by the President.

The FTC further argues (Mot. 29-30) that Express Scripts' Article II claim must be dismissed because Express Scripts has not shown how the statutory removal protections affected

---

[6]      *See* CVS Health, *Independent Pharmacies: Myths Versus Reality* 9 (Aug. 10, 2024), https://www.cvshealth.com/content/dam/enterprise/cvs-enterprise/pdfs/2024/drug-costs/2024-08-10-FTC-White-Paper-on-Independent-Pharmacies.pdf.

the Report—a showing it contends is required by *Collins v. Yellen*, 594 U.S. 220 (2021).  The FTC is correct that, under *Collins*, there is "no reason to regard … actions taken by" an agency head unconstitutionally insulated from removal as "void *ab initio*" if there was "no constitutional defect in the statutorily prescribed method of appointment."  *Id.* at 257-58.  Accordingly, *Collins* required some showing of causal-harm for claims seeking retrospectively to *undo* a prior agreement made by the agency.  *Id.* at 257.  Here, however, Express Scripts seeks prospective relief as a remedy for its Article II claim.  By seeking only a declaratory judgment on its Article II claim that the Report is unlawful due to the FTC's unconstitutional structure, Express Scripts is not petitioning to nullify the FTC's past actions, *id.* at 257.  Indeed, the false Report is out in the world.  Express Scripts is seeking only to halt the ongoing harm the Report is causing by seeking a court order to have it affirmatively withdrawn and to have the Commission that issued it declared to be unconstitutionally insulated from presidential accountability.  *See Space Exploration Technolo-Gies Corp. v. NLRB*, 2024 WL 3512082, at *6 (W.D. Tex. July 23, 2024).

## CONCLUSION

For all the foregoing reasons, the FTC's motion to dismiss the Complaint should be denied.

Dated:  January 30, 2025

Respectfully Submitted,

By: /s/ *Christopher A. Smith*

Sarah C. Hellman, #50373MO
Christopher A. Smith, #53266MO
HUSCH BLACKWELL LLP
8001 Forsyth Ave., Suite 1500
St. Louis, MO 63105
Telephone: (314) 480-1500
sarah.hellman@huschblackwell.com
chris.smith@huschblackwell.com

Jennifer Milici (*pro hac vice*)
Perry A. Lange (*pro hac vice*)
Sabrina Minhas (*pro hac vice*)
WILMER CULTER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
jennifer.milici@wilmerhale.com
perry.lange@wilmerhale.com
sabrina.minhas@wilmerhale.com

Charles F. Rule (*pro hac vice*)
Daniel J. Howley (*pro hac vice*)
Derek W. Moore (*pro hac vice*)
RULE GARZA HOWLEY LLP
901 Seventh Street, NW, Suite 600
Washington, D.C. 20001
Telephone: (202) 843-9280
rule@rulegarza.com
howley@rulegarza.com
moore@rulegarza.com

*Attorneys for Plaintiff Express Scripts, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 30th day of January, 2025 the foregoing was

filed electronically with the Clerk of Court, to be served by operation of the Court's electronic

filing system upon all counsel of record.

/s/      *Christopher A. Smith*